# In the United States Court of Federal Claims

No. 14-255 C

(Filed August 13, 2014)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | Post-Award Bid Protest; |
| SOTERA DEFENSE SOLUTIONS, | * | Protestor's Standing Survives |
| INC., | * | Allegation of Organizational |
| | * | Conflict of Interest; No Waiver |
| *Plaintiff,* | * | of Protest Caused by Delay in |
| | * | Filing Protest of Agency |
| v. | * | Decision to Undertake Corrective |
| | * | Action; Waiver of Post-Award |
| THE UNITED STATES, | * | Protest of Cost Evaluation |
| | * | Scheme Set Forth in Solicitation; |
| *Defendant,* | * | No Unstated Criteria in Re- |
| | * | evaluation of Proposals; Best |
| RAYTHEON CO., | * | Value Award Not Shown To Be |
| | * | Unlawful, Arbitrary, Capricious, |
| *Intervenor defendant.* | * | or an Abuse of Discretion. |
| * * * * * * * * * * * * * * | * | |

*Paul A. Debolt*, Washington, DC, for plaintiff. *James Y. Boland*, *Christina K. Kube*, and *Anna E. Pulliam*, Washington, DC, of counsel.

*Steven M. Mager*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Kirk T. Manhardt*, Assistant Director, Washington, DC, for defendant. *Brian Bentley*, United States Army Legal Services Agency, Fort Belvoir, VA, of counsel.

---

[1]/ This opinion was issued under seal on July 25, 2014. Pursuant to ¶ 8 of the ordering language, the parties were invited to identify source selection, proprietary or confidential material subject to deletion on the basis that the material was protected/privileged. The only proposed redactions were offered by intervenor-defendant. Redacted material is indicated by brackets ([ ]).

*Mark D. Colley*, Washington, DC, for intervenor-defendant.  *Emma V. Broomfield*, *Steffen G. Jacobsen*, and *Dana E. Peterson*, Washington, DC, of counsel.

---

## OPINION AND ORDER

---

**Bush**, *Senior Judge*.

The contract at issue in this bid protest is for the development of an Electronic Warfare Planning and Management Tool (EWPMT); the procuring agency is the United States Army.[2]  This post-award protest is brought by Sotera Defense Solutions, Inc. (Sotera), the former contract awardee, after its award was nullified by corrective action undertaken by the Army in response to a protest brought by Raytheon Company (Raytheon) at the Government Accountability Office (GAO).  Before the court are cross-motions for judgment on the administrative record filed under Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC), as well as motions to dismiss filed by the government and intevenor-defendant Raytheon.

Plaintiff's complaint was filed on April 1, 2014 and amended on April 24, 2014.  The government agreed to stay performance of Raytheon's contract during the pendency of this protest which proceeded under an expedited briefing schedule.  The administrative record (AR) was filed on April 16, 2014 and subsequently corrected on April 29, 2014.  The parties' dispositive motions have been fully briefed; oral argument was held on June 11, 2014.  For the reasons discussed below, plaintiff's motion for judgment on the administrative record is denied; the government's and Raytheon's motions to dismiss are granted in part and denied in part; and, the government's and Raytheon's motions for judgment on the administrative record are granted.

---

[2]/ Electronic warfare eludes succinct definition, but the Army describes it as "the use of electronics to prevent or reduce an enemy's effective use and to protect friendly use of electromagnetic radiation equipment."  Administrative Record at 358.  To give some concrete examples, various types of broadcast and receiving devices, navigational systems and radar units are targeted in electronic warfare.  *Id.* at 638-39.

# BACKGROUND

## I.      Procurement Decision

### A.      Electronic Warfare Planning and Management Tool (EWPMT)

As plaintiff describes the procurement,

> [t]he RFP is for the award of a cost reimbursement, five-year indefinite-delivery, indefinite-quantity ("IDIQ") contract to design, develop and field the Army's EWPMT.  [AR] Tab 7 at 486.  The EWPMT is a new system intended to enhance the Army's existing Electronic Warfare capabilities.  When developed, the EWPMT software will give electronic warfare officers "mission planning capability to plan, coordinate, manage, and deconflict unit EW activities."  *Id.*  The RFP required the awardee to deliver the EWPMT in six "notional Capability Drops (CDs)."  *Id.*  The first task order is for CD1 and will be awarded concurrently with the IDIQ contact, while [CDs 2-6] will be awarded in subsequent task orders.

Pl.'s Mot. at 3-4.  This description is a largely correct overview of the solicitation and the procurement, except for plaintiff's shorthand reference to the contract as a cost reimbursement contract.  The cost structure of the full IDIQ contract is fairly complex, with a cost-plus-incentive-fee structure which would include target cost, incentive fee or profit benchmarks, as well as profit or incentive fee adjustments.  AR at 298-99, 740.  The first task order, CD1, has a relatively straightforward cost-plus-incentive-fee structure.  *Id.* at 740, 7878, 9751.

The solicitation, also known as a Request for Proposals (RFP), issued on December 20, 2012.  AR at 726, 6624, 8106.  An amendment of the solicitation of little consequence to this protest occurred on January 15, 2013.  *Id.* at 726-951, 6624, 8110.  Offers were due by February 4, 2013.

### B.      Evaluation Scheme

The winning proposal would be the proposal offering the best value to the government.  AR at 744.  The four evaluation factors, in descending rank of importance, are:  (1) Technical; (2) Past Performance; (3) Cost; and, (4) Small Business Participation Plan.  *Id.*  The non-cost factors are significantly more important than cost.  *Id.*

Within the Technical Factor are two sub-factors, Technical Approach and Management.  AR at 744.  The Technical Approach sub-factor is more important than the Management sub-factor.  *Id.*  Within the Technical Factor three specific criteria would be reviewed in the offerors' technical proposals:  (1) Understanding the Problems; (2) Feasibility of Approach; and, (3) Adequacy of Response/Completeness.  *Id.*  Page limits were imposed for the offerors' technical proposals.  *Id.* at 732.  For the Technical Factor, the range of ratings were Outstanding, Good, Acceptable, Marginal and Unacceptable, and the evaluation team would also identify strengths and weaknesses.  *Id.* at 338-39.

The Cost Factor would be evaluated based on the costs of the first task order, CD1.  *See* AR at 739 ("Offerors are instructed to provide proposed costs for Task Order 1 only.").  Significant amounts of detail were required for the offerors' proposed costs.  *Id.* at 739-40.  This detailed information would allow the agency to

> evaluate the realism of Offeror's proposed costs in relation to the Offeror[']s specific technical approach to Task Order 1.  The Offeror's proposed costs will be evaluated by determining what the Government predicts the Offeror's approach would most probably cost the Government when the work performed under Task Order 1 is completed.  To the degree that the Government's most probable cost estimate differs from the Offeror's proposed cost, the Offeror's proposed cost and incentive fee may be adjusted for the purposes of evaluation.

AR at 745.

### C.    Evaluation of Proposals and Award to Sotera

### 1.    Bids Received and Discussions Held

Six timely bids were received.  Raytheon was designated as "Offeror A" in the evaluation documents and Sotera was designated as "Offeror B."  Throughout the evaluation process, the ratings for Sotera and Raytheon were very close and their proposals were ranked higher than the other proposals.  *See, e.g.*, AR at 6623, 7410.  Nonetheless, discussions were initiated because even the leading offerors' proposals were [ ] in at least one factor.  *Id.* at 6628.  In successive competitive range determinations, two lower-ranked offerors were eliminated from the competition.  Through discussions, both Sotera and Raytheon were able to improve the ratings of their proposals, but neither offeror was able to pull very far ahead of the other in the proposal ratings.

### 2.    Best Value Award to Sotera

Once the four final proposals were evaluated, the non-cost evaluation factors for Raytheon and Sotera were similarly rated.  For Technical Approach, Raytheon received an Outstanding rating, with five strengths and one weakness.  AR at 7429-30.  Sotera, for this same sub-factor, also received an Outstanding rating, with five strengths and two weaknesses.  *Id.* at 7481-83.  For the Management sub-factor, Raytheon received an Acceptable rating, with zero strengths and zero weaknesses.  *Id.* at 7433-34.  For this sub-factor, Sotera also received an Acceptable rating, with zero strengths and zero weaknesses.  *Id.* at 7486.  Thus, the overall Technical Factor rating for both Raytheon and Sotera was Good.

Turning to the less important non-cost factors, for Past Performance Raytheon received a Substantial Confidence rating, as did Sotera, although Sotera's rating was slightly above Raytheon's in one respect.  AR at 7456, 7504-05, 7640.  Raytheon ranked better than Sotera in the Small Business Participation Plan factor, the least important evaluation factor.  For this factor, Raytheon received an Outstanding rating with six strengths and no weaknesses, whereas Sotera received a Good rating with two strengths and no weaknesses.  AR at 7472-73, 7517-18.

There was, however, a not insignificant difference in the cost of these offerors' proposals for CD1.  Raytheon's evaluated price was $11,258,505;

Sotera's evaluated price was $10,325,671.[3]  AR at 7469, 7513.  The difference in price between the two proposals is described as either a difference of 8.3%, *id.* at 7529 (concluding that "Offeror B's cost [is] 8.3% lower [than Offeror A's cost]"), or a difference of 9%, *id.* at 7639 (concluding that the difference in prices "equates to a 9% difference").  It would be accurate to state that Sotera's proposal was evaluated to cost approximately 8.3% less than Raytheon's proposal.

The Source Selection Authority's trade-off analysis comparing non-cost with cost factors for Raytheon (Offeror A) and Sotera (Offeror B) concluded that

> [i]n consideration of the equal Technical ratings, the more advantageous Past Performance and Cost Factor assessments which outweigh the differences in the Small Business Participation Plan assessments, it is my determination that the proposal submitted by Offeror B provides superior value to the Government than the proposal provided by Offeror A.

AR at 7640.  The EWPMT contract was awarded to Sotera on June 28, 2013, and the CD1 task order was awarded to Sotera on July 1, 2013.  Both Sotera and Raytheon asked for debriefings regarding the award decision.

## D.   Raytheon's Protest and the Army's Corrective Action

Raytheon raised numerous issues regarding the Army's award in its debriefing.  AR 8042-59.  In one particular instance, Raytheon suggested that a recently-hired Sotera employee had access to proprietary information of other offerors through his prior contract work for the Army, and that Sotera's proposal was thus tainted by an organizational conflict of interest (OCI).  *Id.* at 8042-43.  The OCI concern was investigated for two weeks by the Army, from July 3, 2013 through July 17, 2013, and the results of this limited investigation re-assured the Army that no OCI had skewed the competition for the EWPMT contract.  *Id.* at 8056-59.

---

[3]/  The Army reports the evaluated price for Raytheon either as $11,258,505 or $11,258,506.  *Compare* AR at 7469, *with id.* at 7529.

After its debriefing with the Army, on July 22, 2013 Raytheon timely filed a protest of the award at the GAO.  Raytheon's protest was robust and thorough – it featured a detailed sixty-page brief and over three hundred pages of exhibits. AR Tab 48.  The protest included arguments such as:  (1) the award to Sotera was "flawed because of the existence of several organizational conflicts of interest"; (2) "the [Source Selection Authority] failed to look behind the ratings and qualitatively assess the underlying technical differences of the proposals to determine whether the various risks and benefits justified a 9% ($900K) cost differential"; (3) the Management sub-factor rating was not "a comparative, qualitative evaluation"; and, (4) the Army "failed to properly apply its relevancy standards" in the Past Performance evaluation.  *Id.* at 8102-03.

Internally, the Army crafted a corrective action plan to separately address the OCI allegations *and* the evaluation errors alleged by Raytheon.  AR at 8499-500.  Although the terminology used in the internal plan is not perfectly consistent, a re-evaluation of final proposals was a key element of the plan.  *Id.* at 8500 ("The Agency will *re look* at the evaluations of all offerors in the final competitive range, and in addition will specifically examine the following [alleged flaws] as [they] pertain[] to the allegations set forth in Raytheon's protest . . . .") (emphasis added); *id.* ("Upon completion of the Agency's *re evaluations*, the Agency[] will take appropriate action based on the results of the *re evaluation*.") (emphases added).  In essence, the re-evaluations would address the allegations of evaluation errors highlighted by Raytheon in its GAO protest and would either confirm the award to Sotera or produce another proposal evaluation result.

On August 15, 2013, the Army proposed the following corrective action so as to render Raytheon's protest at the GAO moot:

> The Army believes that it is in its best interest to take corrective action in this protest by fully investigating the OCI allegations and facts related to them and, if warranted, take appropriate action resulting from any finding of an OCI or appearance thereof made by the contracting officer.
>
> The Army also will examine all proposals and evaluations for offerors in the final competitive range (this includes Protester), and will re-evaluate as

> appropriate.  If the re-evaluations result in any changes, the source selection authority will render a new source selection decision.

AR at 8506.1.  The Army further clarified, after Raytheon disputed whether the corrective action would provide adequate notice of the results of the OCI "investigation and re-evaluation activity," *id.* at 8506.4, that "the Army intends to announce a new award decision, or confirmation of its previous decision, in writing to the parties promptly after such decision is made.  This notice will be provided to the parties regardless of the outcome of the decision."  *Id.* at 8506.5.  The GAO then dismissed Raytheon's protest as moot on August 21, 2013.

As for the OCI investigation, Sotera provided the Army with a well-argued "white paper" rejecting the proposition that an OCI tainted Sotera's proposal.  AR Tab 53.  The Army conducted a thorough OCI investigation which lasted from July 22, 2013 into October 2013.  *Id.* at 8671-75.  The Army determined, again, that Sotera's proposal was not barred by an OCI and produced a six-hundred page report which documented the investigation and this finding.  *See id.* Tab 57.

### E.      Re-evaluation of Proposals and Award to Raytheon

The proposal evaluation personnel for the Army were organized into a three-tiered hierarchy:  (1) the Source Selection Authority (SSA), with ultimate award authority; (2) the Source Selection Advisory Council (SSAC), with supervisory authority over the evaluation process; and, (3) the Source Selection Evaluation Board (SSEB), with evaluation factor rating responsibilities.  AR at 333-36.  Once the Army decided to re-evaluate proposals, the SSAC Chair sent an email to members of the SSEB.  This email included the following instructions:

> Steve/SSEB Team, as you reassess ratings for each of the 4 Offerors from the final competitive range ensure that you are following [Source Selection Evaluation Plan (SSEP)] guidance in strict accordance with evaluation criteria and definitions.  In addition,
>
> I would like extra emphasis placed on the following:
>
> Technical Approach

·        Quantify schedule risk regarding any pre-award activities completed by each Offeror

·        Assess each Offerors estimated "% complete and ready for integration testing" and how much [software lines of code (SLOC)] is prior leveraged efforts vice Govt furnished [government off the shelf (GOTS)]/[commercial off the shelf (COTS)]

Management

·        Assess EXTENT to which requirements are met/exceeded vice a "go/no go" for elements identified under the Management subfactor (e.g. subcontract management, [software] development process, [Capability Maturity Model Integration (CMMI)] levels, [Quality Assurance], training, schedule risk (not just [Integrated Master Schedule] details), etc. . . and provide assessment if a superior approach lowers risk or is sufficiently advantageous to the Govt to warrant a Strength [in accordance with] the definition

·        Mgmt and Technical Team to discuss the merits if CMMI Lvl 5 (highest quality / lowest risk) certification vs lower CMMI levels, e.g. CMMI Lvl 3 (med quality / med risk) and whether higher CMMI levels are advantageous to the Govt for the EWPMT effort.  Also assess CMMI levels for subs and quantify extent of performance the sub is performing in relationship to overall CD1.  Does a higher CMMI Lvl for a sub have equal merit to a prime with a high CMMI level?

·        Do software productivity initiatives, e.g. SWIFT or other efficiencies merit value to the Govt and

hence a Strength?  Look at this across all 4 Offerors

· Look closely at subcontractor management initiatives, pre-award investments, and extent to which these mitigated cont[r]act performance risks

· Where does schedule risk (or risk reduction) come into the Management subfactor rating assessment? How is this different then Technical?

Past Performance

· Ensure proper application of relevancy standards (4 levels) and relevancy definition for prime and subcontracts[]

· Look how individual assessments of prime/sub are derived and any "weighting" based on extent and nature of their underlying past performance

· Be sure to factor in Extent (% of total contract) and nature of proposed sub performance on the EWPMT contract vice that of past performance

· If Offeror propose[s] to leverage prior scope for insertion into EWPMT CD1 solutions, how does this influence the RELEVANCY assessment?

I'd like to discuss in more detail at our 26 Aug status update

AR Tab 51.

The re-evaluation of proposals by the SSEB was completed by October 16, 2013.  Broadly speaking, some evaluation ratings remained unchanged for all four offerors:  (1) the Technical Approach sub-factor ratings, as well as the strengths and weaknesses in this sub-factor; (2) the overall Past Performance Confidence ratings; (3) the Small Business Participation Plan ratings, as well as the strengths

and weaknesses in this factor; and, (4) the Cost Factor evaluated prices of the proposals. AR at 8555. Raytheon, however, made significant gains in the Management sub-factor, gaining a strength and improving this sub-factor rating from Acceptable to Good. *Id.* at 8555, 9249. This Good rating in the Management sub-factor then triggered an overall rating in the Technical Factor of Outstanding, rather than Good (Raytheon's former rating in this evaluation factor).

Sotera, as noted *supra*, retained its cost advantage over Raytheon in the re-evaluation process, but lost the slight edge it previously had enjoyed in the Past Performance Factor. This change was due to a correction of the weight previously assigned to the past performance of Sotera's sub-contractors. AR at 8555, 9341, 9372. Once the re-evaluation results were considered by the SSAC, Raytheon's proposal presented advantages in its Technical Approach, Management, Past Performance and Small Business Participation Plan. *Id.* at 9477-78. These advantages outweighed Sotera's lower cost. *Id.*

The SSA concurred with the SSAC and found Raytheon's proposal to be the best value for the EWPMT project. AR Tab 62. Sotera's contract was terminated for the convenience of the government on December 2, 2013. Raytheon was awarded the EWPMT contract on December 2, 2013 and the CD1 task order on December 3, 2013. Both Sotera and Raytheon requested and received debriefings regarding the award.

## II.     Protests by Sotera

### A.     Sotera's Protest at the GAO

On December 10, 2013, Sotera timely filed a protest of the contract award to Raytheon with the GAO, but did not protest the Army's decision to re-evaluate proposals. AR Tab 74. Even in two subsequent supplemental GAO protests, Sotera never contended that the Army improperly chose to re-evaluate the EWPMT proposals in the corrective action that mooted Raytheon's protest of the prior award to Sotera. *See id.* Tabs 77, 91. Instead, Sotera argued that the decision to award the contract to Raytheon was flawed for a number of reasons, including failure to follow evaluation criteria and to perform appropriate cost realism and trade-off analyses. *Id.* at 9987.

In supplemental protests at the GAO, Sotera raised additional allegations of error.  For example, in the first supplemental protest Sotera argued that the re-evaluation and the award decision were tainted both by Raytheon's prior protest at the GAO and by the Army's failure to investigate potential OCI's on the part of Raytheon.  AR at 10660-61.  In the second supplemental protest, Sotera highlighted additional alleged evaluation errors, including an accusation that the re-evaluation employed "unstated evaluation criteria."  *Id.* at 12438.  Throughout the GAO protest proceedings, Sotera repeatedly requested production of any written instructions provided to the SSEB for the re-evaluation of proposals, and was repeatedly told by the Army that written instructions to the SSEB did not exist.  Sotera's protest at the GAO was denied on March 20, 2014.

### B.  Sotera's Protest in this Court

#### 1.  Initial Complaint

The initial complaint filed by Sotera contained three counts.  Count I focuses on the Army's decision to re-evaluate proposals.  In this count Sotera argues that it is unlawful to "abandon a lawful contract award," and that it was arbitrary and capricious for the Army to conduct a new evaluation of proposals when there was no clear error in the old one.  Compl. ¶ 91.

In Count II, Sotera argues that the re-evaluation of proposals and the best value award decision were flawed in several respects.  One part of Count II questions whether Raytheon's higher evaluated price was correctly weighed in the trade-off analysis, and posits that Raytheon's actual costs over the life of the contract will be much higher than Sotera's actual costs.  Another part of Count II debates the relative technical strengths of Raytheon's and Sotera's proposals.

In Count III of the original complaint, Sotera attacks the cost evaluation of proposals performed by the SSEB.  Because Raytheon had already achieved some of the milestones required for CD1, Sotera argues that Raytheon's cost proposal for CD1 made Raytheon's contract performance appear to be much cheaper than it would actually be over the life of the contract.  Thus, Sotera argues that "Raytheon's 'evaluated cost,' which was supposed to be indicative of Raytheon's total cost for the EWPMT program, was dramatically and arbitrarily under-evaluated.  The Army arbitrarily failed to account for Raytheon's unique cost assumptions, which were not contemplated by the RFP."  Compl. ¶ 134.

In the original complaint's prayer for relief, plaintiff requests a declaratory judgment affirming the arguments presented in Counts I-III.  In addition, Sotera seeks "[a]n injunction directing the Army to terminate the contract awarded to Raytheon and reinstate the original award to Sotera since the Army cannot prove that the original award to Sotera was unlawful."  Compl. at 27.  In the alternative, Sotera requests "an injunction directing the Army [to] conduct a rational and lawful evaluation and best value source selection decision consistent with the Court's decision in this case."  *Id.*

## 2.    Written Instructions to the SSEB Disclosed in the Administrative Record Filed in this Case

Once the government filed the AR in this case, plaintiff learned that the SSAC Chair had indeed provided some written instructions to the SSEB for the re-evaluation of proposals in an email.  *See* AR Tab 51.  Within a week Sotera moved to amend its complaint, stating that "[t]he Army's concealment and misrepresentations [as to the existence of written instructions to the SSEB] not only prevented Sotera from adequately arguing its case before the GAO, but it prevented Sotera from including this [proposed additional] protest count in the original complaint."  Pl.'s Mot. of Apr. 23, 2014, at 3.  Leave to amend the complaint was granted, and the amended complaint, adding a Count IV and revising the prayer for relief, was filed on April 24, 2014.[4]

## 3.    Amended Complaint

Although Counts I-III of the original complaint remain unchanged, the amended complaint contains a new Count IV and a revised request for relief.

---

[4]/ On May 6, 2014, Sotera moved to amend the protective order in this case so that the GAO could be provided with the amended complaint and the newly disclosed document containing the written instructions to the SSEB, which were both filed under seal in this case. The government opposed the motion and the court deferred ruling on the motion at that time.  At oral argument, the court asked counsel arguing for plaintiff whether the motion to amend the protective order was now moot, given that the GAO has had access to much of the information, in redacted form, that was the subject of plaintiff's motion.  Counsel replied that the motion was probably moot, in his view, and that plaintiff could always renew the motion at a later time.  Oral Argument Transcript (Tr.) at 91.  On June 26, 2014, plaintiff moved to withdraw its motion to amend the protective order and filed an unopposed motion to release a redacted version of AR Tab 51.  Both motions filed June 26, 2014 are granted.

Count IV alleges that "the Army applied unstated evaluation criteria [in the proposal re-evaluations] that were created by the SSAC Chair to accommodate Raytheon's particular concerns [that were presented in Raytheon's GAO protest]." Am. Compl. ¶ 141.  According to Sotera, the use of these unstated criteria rendered the proposal re-evaluations and the award to Raytheon unlawful and unfair.  *Id.* ¶ 167.

The revised prayer for relief continues to ask for a declaratory judgment affirming the arguments presented in the counts of the complaint, now four in number.  Sotera also continues to ask for "[a]n injunction directing the Army to terminate the contract awarded to Raytheon and reinstate the original award to Sotera since the Army cannot prove that the original award to Sotera was unlawful."  Am. Compl. at 34-35.  As an alternative remedy, however, Sotera suggests that an additional condition be placed on further evaluations of proposals.  Plaintiff seeks

> an injunction directing the Army [to] replace the entirety of the evaluation teams (including SSEB, SSAC, and SSA), and then conduct a rational and lawful evaluation and best value source selection decision with new evaluators in a manner that is consistent with the Court's decision in this case[.]

*Id.* at 35.

### 4.    Dispositive Motions and Attached Exhibits

#### a.    Pending Motions

Plaintiff's motion for judgment on the administrative record largely tracks Sotera's amended complaint, although the motion addresses the counts of the amended complaint in this order:  Count IV (unstated evaluation criteria for the re-evaluation of proposals); Count I (improper decision to re-evaluate proposals); Count II (arbitrary re-evaluation of proposals and best value award); and Count III (arbitrary cost evaluation).  Both defendant and Raytheon include motions to dismiss with their motions for judgment on the administrative record.  All of the briefs are well-written and supported by citation to relevant authority.

14

The government moves to dismiss Count I (improper decision to re-evaluate proposals) and Count III (arbitrary cost evaluation) as waived under the authority of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Raytheon moves to dismiss the entire complaint, stating that Sotera has no standing to bring this protest due to an alleged OCI.  Further, Raytheon agrees with the government that Count I (improper decision to re-evaluate proposals) is untimely and waived.  Finally, Raytheon again agrees with the government that Count III (arbitrary cost evaluation) is untimely and waived, because Count III "is a challenge to the Solicitation ground rules for the cost realism evaluation, and is therefore patently untimely."  Raytheon Mot. at 48.  Even if their motions to dismiss are denied, both the government and Raytheon argue that the record in this case shows that the Army's award decision withstands all of the challenges presented in Counts I-IV of Sotera's amended complaint.

### b.    Proposed Supplements to the Administrative Record

To resolve this protest, the court relies on the amended complaint, the administrative record and the parties' briefing of their dispositive motions.  To plaintiff's motion for judgment on the administrative record was attached an exhibit, Exhibit A, which is an additional, omitted email in a chain of emails presented in the AR.  At oral argument the parties agreed that this Exhibit A is unobjectionable as a supplement to the administrative record.  Oral Argument Transcript (Tr.) at 98-99.  The court agrees that this email should complete the administrative record.

There was no such agreement as to other exhibits attached by the parties to their dispositive motions and reply briefs.  The court notes that no formal motions to supplement the administrative record were filed in this protest.  As explained in the analysis section of this opinion, the other exhibits attached to the parties' motions are not appropriate supplements to the administrative record.  *See infra* nn.12,18-19.  The court does, however, rely on the exhibits attached to Raytheon's motion, not as supplements to the administrative record but as supporting documentation necessary for an alternative holding regarding Sotera's standing to bring this bid protest.  *See infra*.  The court now turns to its resolution of the parties' motions.

### DISCUSSION

## I.       Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citation omitted).

## II.      Standards of Review

### A.       Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

### B.       Bid Protest Review

First, the plaintiff in a bid protest must show that it has standing to bring the suit. *ITAC*, 316 F.3d at 1319. This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror. *Id.* (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2012)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (describing this court's standard of review for bid protests). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (*Impresa*) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary and capricious. *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980) (citation omitted). Negotiated procurements give a "breadth of discretion" to the contracting officer and impose a heavier burden of proof on a protestor. *Id.* at 598 (citation omitted). Similarly, "best value" contract awards give a contracting officer more discretion than awards based on price alone. *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). Thus, the protestor's burden is especially heavy in negotiated, best value procurements. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 380 (2003) (citations omitted), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

The deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation. "[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449 (citations omitted); *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 578 (2002) ("It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals." (citing *E.W. Bliss*, 77 F.3d at 449)). "[W]here an agency's

decisions are highly technical in nature, . . . judicial restraint is appropriate and proper." *Electro Methods, Inc. v. United States*, 7 Cl. Ct. 755, 762 (1985) (citing *Isometrics v. United States*, 5 Cl. Ct. 420, 423 (1984)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)).  If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. The protestor again bears the burden of proof, and must "show that there was a 'substantial chance' [the plaintiff] would have received the contract award but for the [government's] errors in the bid process." *Id.* at 1358 (citations omitted).  If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted).  "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## C.   Supplementation of the Administrative Record

In *Axiom Resource Management, Inc. v. United States*, 564 F.3d 1374 (Fed. Cir. 2009), the Federal Circuit identified the acceptable circumstances under which the administrative record may be supplemented in a bid protest.  The *Axiom* panel criticized a decision by this court which permitted supplementation of the administrative record in a bid protest, and criticized the trial court's over-broad reliance on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), a case which provides a list of possible justifications for the supplementation of the administrative record of an agency action. *Axiom*, 564 F.3d at 1379-81.

The court notes that the *Axiom* panel adopted a restrictive standard for supplementation of the administrative record in a bid protest, and favorably cited *Murakami v. United States*, 46 Fed. Cl. 731 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005). *Axiom*, 564 F.3d at 1380.  The *Axiom* standard for supplementation of the administrative record in a bid protest is a direct quotation from *Murakami*, stating that "supplementation of the record should be limited to cases in which 'the

omission of extra-record evidence precludes effective judicial review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735).  The Federal Circuit relied on the cases cited by this court in *Murakami* to conclude that "[t]he purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Id.* (quoting *Murakami*, 46 Fed. Cl. at 735, and citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  The thrust of the *Axiom* decision, and *Murakami*, is that this court must exercise restraint when considering whether or not to supplement the administrative record in a bid protest.  *See id.* (favoring a "more restrictive approach" and questioning the vitality of *Esch*) (citations omitted); *Murakami*, 46 Fed. Cl. at 735 (stating that the construction of the *Esch* justifications for allowing supplementation of an administrative record should be "extremely limited") (citations omitted).  For these reasons, this court has carefully considered the documents attached by the parties as exhibits to their briefs to consider whether these documents should supplement the administrative record.

## III.   Standing

Although the government does not contend that Sotera lacks standing to bring this bid protest, Raytheon moves to dismiss Sotera's protest on standing grounds because of an alleged OCI that it argues impairs Sotera's eligibility for contract award.  Raytheon Mot. at 7-19.  In its opening brief on this issue, Raytheon fails to cite a single bid protest decision with analogous facts, *i.e.*, a case where a protestor's standing was destroyed by an alleged OCI that the agency had already investigated and eliminated as a cause for concern.  In essence, Raytheon asks this court to substitute its judgment for that of the agency on the OCI issue, and to employ a de novo review of this issue to deprive Sotera of standing.  In the court's view, relevant bid protest caselaw does not support Raytheon's motion.

First, as noted *supra*, standing in bid protests is established if the protestor possesses a substantial chance of receiving the contract award if its allegations of procurement error are sustained by the court.  *ITAC*, 316 F.3d at 1319.  Here, Sotera once won the contract award, is currently second in line for award, and has been determined by the procuring agency to have no OCIs.  The Army has, in other words, shown no indication that it would deny Sotera the contract award because of the alleged OCI, and no other impediment to Sotera's standing has been identified by intervenor-defendant.  The record thus clearly shows that Sotera

has a substantial chance of contract award and standing to bring this suit. *See, e.g.*, *Bilfinger Berger AG Sede Secondaria Italiana v. United States*, 97 Fed. Cl. 96, 135 (2010) ("A prejudice determination for the purpose of evaluating standing is a 'limited review' that seeks 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'" (quoting *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005)).

It was only at oral argument that Raytheon pointed to support from a recent case decided by this court, *Bannum, Inc. v. United States*, 115 Fed. Cl. 148 (2014), for its standing argument. *Bannum* and similar cases, however, merely stand for the proposition that the court may rule on the standing issue based on disqualifying elements of a protestor's proposal that the agency has overlooked. *See, e.g.*, 115 Fed. Cl. at 155-56 (stating that "in assessing standing, this Court is not bound by the finding in the Source Selection Decision or required to apply the [deferential] APA standard of review . . . [because] the Court must ascertain its own jurisdiction and, in doing so, [it] is not bound by an agency's mistake in overlooking a non-compliant proposal") (citing *Dismas Charities, Inc. v. United States*, 75 Fed. Cl. 59, 61-62 (2007)); *Dismas*, 75 Fed. Cl. at 61-62 (finding that a protestor lacked standing despite the fact that the procuring agency's "Source Selection Decision . . . never explicitly stated that [the protestor's proposal] did not comply with the solicitation") (citing *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 140 (2006)).  Here, Raytheon is not attempting to point out an overlooked aspect of Sotera's proposal that renders Sotera ineligible for award – instead, Raytheon asks the court to overturn the agency's OCI ruling. *Bannum* offers no support for that course of action.

Plaintiff suggests that Raytheon's standing challenge is, in essence, a protest of the Army's OCI ruling.  Pl.'s Reply at 10-11.  In the court's view, it does not matter how Raytheon's motion to dismiss is characterized.  Ultimately, Raytheon has produced no authority stating that a de novo OCI review is required to confirm a protestor's standing to bring a bid protest, when the agency has fully considered the OCI allegation and has ruled against the existence of an OCI.  Under Raytheon's construction of this court's bid protest standard of review, an agency's OCI ruling would be afforded *less deference* in a challenge to a protestor's standing than such an OCI ruling would receive in a challenge to an awardee's eligibility for contract award on the merits. *See, e.g.*, *Axiom*, 564 F.3d at 1382 (stating that an agency's ruling regarding an awardee's OCIs should not "trigger[] de novo review" because the deferential arbitrary and capricious standard applies).

Such an incongruous and inconsistent application of deference to procuring agencies' OCI rulings is logically unsupportable.

Thus, even if the court, in the circumstances of this procurement, considered it appropriate to conduct a review of Raytheon's OCI allegations to confirm Sotera's standing, which it does not, and even if the court agreed that the AR should be supplemented with the materials attached to Raytheon's motion to dismiss, which it again does not, the court believes that deference would nonetheless be due the Army's OCI ruling and that the arbitrary and capricious standard of review would apply. In other words, the court would follow *Axiom* and only overturn the Army's finding that Sotera's eligibility for award was not destroyed by an OCI *if* the court determined the Army's finding regarding OCIs to be unreasonable.

The identification and mitigation of OCIs are examples of discretionary procurement decisions by a federal agency that are due deference from this court. As stated in *Axiom*,

> the [Federal Acquisition Regulation (FAR)[5]] recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion. *See* 48 C.F.R. § 9.505 ("Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it."); *see also* [*ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 202 (2007)] ("The responsibility for determining whether such unequal access exists and what steps

---

[5]/ All citations to the FAR in this opinion are to the current version of Title 48 of the Code of Federal Regulations, which does not appear to differ in any material respect from the versions that were in force at times relevant to the procurement actions challenged in this bid protest.

should be taken in response thereto rests squarely with
the contracting officer.").

564 F.3d at 1382. Having considered the three exhibits attached to Raytheon's
motion, and the arguments Raytheon presents regarding Sotera's alleged OCI, the
court finds nothing of sufficient concern to cast doubt on the reasonableness of the
Army's OCI ruling presented in AR Tab 57.[6]

Finally, if an alternative de novo review of the OCI issue could be justified,
the court would come to the same conclusion reached by the Army in 2013 after
an extensive investigation. The technical elements of Sotera's proposal were not
substantively revised after Mr. Chet Wilson, the employee who allegedly
possessed proprietary knowledge of Sotera's competitors' technical approaches,
joined Sotera's workforce. Although discussions, through Evaluation Notices
(ENs) and responses thereto, permitted Sotera to expound upon aspects of its
proposal that had previously received weak ratings, and to provide supporting
documentation that responded to requests for more detailed explanations of
Sotera's plan of work, no substantive changes were made to the proposal
originally submitted to the Army. *See* AR Tabs 9, 17, 19, 30. Furthermore, Mr.
Wilson was bound by protocols not to divulge proprietary information gleaned
from past work experiences. S*ee id.* at 8677-81. The court must agree with the
contracting officer who stated that:

> Given the nature of the limited scope of the ENs issued
> to Sotera and the responses received, coupled with the
> performance-based nature of the EWPMT effort which
> called for no specific approach, the fact that Sotera had
> developed and proposed its approach/solution prior to
> employing Mr. Wilson, the type of Raytheon
> "proprietary" information to which Mr. Wilson had
> access, and the fact that the ENs issued by the
> Government during discussions specifically sought and
> obtained clarification and detail on the approach

---

[6]/ AR Tab 57 is not carefully indexed by defendant. The contracting officer's findings
are on pages 8645, 8665-94; conclusions regarding the OCI allegations are found on pages 8691-
94. An index of enclosures is found on page 8695. The Army's accompanying legal analysis of
Raytheon's OCI allegations is found on pages 9236-46.

> proposed by Sotera prior to Mr. Wilson beginning
> employment or reviewing the ENs, I have concluded that
> although Mr. Wilson had access to information marked
> as proprietary by Raytheon, said information was not
> competitively advantageous to Sotera in the preparation
> of its proposal or in responding to ENs, and therefore did
> not prejudice Raytheon in any way.

*Id.* at 8683.  Thus, even through the lens of a de novo review of Raytheon's OCI allegations, Sotera is not ineligible for award because of an OCI; plaintiff has standing to bring this protest.  *ITAC*, 316 F.3d at 1319.

## IV.   Analysis for Count I of the Amended Complaint[7]

### A.   No Waiver of Count I Caused by Delay in Filing Protest of Agency Decision to Undertake Corrective Action

#### 1.   Binding Precedent

Both the government and Raytheon contend that *Blue & Gold Fleet* bars this court's consideration of Count I of the complaint.  Their basic contention is that Sotera should have protested the Army's decision to re-evaluate proposals before the results of that re-evaluation were revealed by the award to Raytheon.  This contention is premised on an extension of the holding in *Blue & Gold Fleet* which states that

> a party who has the opportunity to object to the terms of
> a government solicitation containing a patent error and
> fails to do so prior to the close of the bidding process
> waives its ability to raise the same objection
> subsequently in a bid protest action in the Court of
> Federal Claims.

492 F.3d at 1313.

---

[7]/  The court addresses the counts of the amended complaint in the following order: Count I, Count III, Count IV, Count II.

Here, no solicitation term is at issue – it is the Army's corrective action that might have triggered waiver of a bid protest ground.  In particular, the protest-worthy action, according to the government and Raytheon, is the Army's stated intent to

> examine all proposals and evaluations for offerors in the final competitive range (this includes [Raytheon]), and [the Army] will re-evaluate as appropriate.  If the re-evaluations result in any changes, the source selection authority will render a new source selection decision.

AR at 8506.1.  The defendants in this case rely upon a variety of authorities for their waiver argument, but the Federal Circuit precedent cited is almost entirely dicta and of minimal precedential value.

The waiver rule in *Blue & Gold Fleet* has been extended in *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012), so that protests of the terms of an *amendment* to a solicitation are waived if not raised before award.  *See id.* at 1382 & n.5 (stating that "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to [an amended] solicitation containing a patent error or ambiguity [excepting latent errors or ambiguities] prior to the award of the contract" (citing *Blue & Gold Fleet*, 492 F.3d at 1313)).  This *COMINT* extension of *Blue & Gold Fleet* to solicitation amendment scenarios is, however, inapplicable to the facts of this bid protest, where no solicitation amendment occurred as part of the Army's corrective action.  Furthermore, although there is brief commentary in the *COMINT* decision which looks to GAO timeliness rules as support for the rationale of *COMINT*'s extension of the waiver rule of *Blue & Gold Fleet*, this general endorsement of the GAO's approach to delay-based waiver must be construed, at most, as dicta regarding the propriety of extending *Blue & Gold Fleet*'s waiver rule beyond the scope of the waiver holding in *COMINT*.

There is additional dicta in *Systems Application & Technologies, Inc. v. United States*, 691 F.3d 1374 (Fed. Cir. 2012) (*SA TECH II*), regarding the waiver rule set forth in *Blue & Gold Fleet*.  At issue in that appeal was the government's allegation that the bid protest of a corrective action was not ripe, *not* that a protestor had waived its right to protest by delaying its protest until a new award decision had issued.  *Id.* at 1383-85.  In particular, the government contended that

the apparent awardee could not protest a corrective action until the government concluded its corrective action and re-awarded the contract to another bidder.  *Id.* at 1384.  The Federal Circuit disagreed, because "the Army's proposed finality rule would make some of their actions protest-proof."  *Id.*

The only specific discussion of "protest-proof" actions being immune from review because of a waiver of protest grounds is this statement in *SA TECH II*:

> If SA-TECH's claims were not ripe until after the contract award, then SA-TECH could never protest th[e] proposed amendment to the terms of the solicitation [which was part of its challenge to the corrective action].

691 F.3d at 1384-85 (citing *Blue & Gold Fleet*, 492 F.3d at 1313).  Because this commentary is dicta, and could just as easily be read to *not extend* as to *extend* the waiver rule in *COMINT* and *Blue & Gold Fleet*, the court finds *SA TECH II* to be of no value in resolving the waiver issue in this case.  The court now turns to a brief discussion of the caselaw and GAO decisions relied upon by the government and Raytheon to argue that an extension of *Blue & Gold Fleet*'s waiver rule is warranted in the circumstances of this protest.

## 2. Federal Claims Court Cases

According to defendant, relying in particular on a number of protest ripeness cases decided by this court, a delayed protest of a corrective action is waived.  Def.'s Mot. at 15.  A discussion of the ripeness of a particular protest, however, is no indication that this court has actually extended the waiver rule in *Blue & Gold Fleet* to protests of corrective actions that are separate and distinct from solicitation amendments.  Although ripeness and waiver are related concepts, a holding deciding the ripeness of a bid protest does not confirm that this court has extended *Blue & Gold Fleet* to protests of re-evaluation decisions in the context of corrective actions by agencies responding to a GAO protest.

Raytheon, in its reply brief, cites to better cases which discuss the waiver rule in the context of untimely challenges to government actions in a procurement – actions other than solicitation amendments.  Raytheon Reply at 5-6.  These cases are: *Communication Construction Services, Inc. v. United States*, 116 Fed. Cl. 233, 263-64 (2014) (waiver of a protest ground founded on an alleged OCI that

was known to the protestor before bids were submitted); *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 712 (2011) (waiver of a protest ground founded on an alleged OCI that was known to the protestor before bids were submitted); *Ceres Environmental Services, Inc. v. United States*, 97 Fed. Cl. 277, 310 (2011) (waiver of a protest ground founded on an "obvious procurement procedure" which disclosed the protestor's pricing to competitors, because this procedure was known to the protestor before bids were submitted).

While the three cases cited by Raytheon are instructive, they do not bind the court in this case. In addition, the facts of those cases are not very similar to the facts of this case. For example, all three of the cited cases involved a protestor that possessed knowledge of an alleged procurement defect, that faced a fixed deadline for protesting that defect (before the submission of bids), and that waited for the results of an evaluation process before protesting the alleged defect. Here, there was no upcoming bidding deadline because proposals were already in the hands of the Army. Waiver because of delay is less easily discerned when there is no proposal submission deadline that clearly demarcates timely and untimely protests.

At oral argument, the court inquired as to when Sotera should have protested the re-evaluations of proposals in order to avoid waiver under *Blue and Gold Fleet*. Raytheon stated that Sotera should have acted "within a reasonable time," and that waiting to raise this challenge until after Sotera had lost its GAO protest was "way too long."[8] Tr. at 67-69. The government stated that although the usual rule is that the protest must be lodged before award, when a GAO protest is dismissed as moot the protestor must protest the corrective action before the GAO protest is dismissed.[9] *Id.* at 39-40. Plaintiff stated that even if *Blue & Gold Fleet* could be applied to this type of scenario, no waiver deadline would be

---

[8] The court notes that there is no requirement that a protestor raise each and every protest ground before the GAO before those protest grounds may be raised in a protest before this court. New protest grounds in cases before this court are not waived merely because the GAO had no chance to consider them in a previous protest. *See, e.g.*, *Centech Grp., Inc. v. United States*, 78 Fed. Cl. 496, 507 n.20 (2007) (stating that "the right to file a protest in the Court of Federal Claims is unaffected by GAO's protest process" (citing 31 U.S.C. § 3556 (2012)).

[9] Under the government's rule Sotera would have had four business days from the initial corrective action notice, or two business days from the clarified corrective action notice, within which to have filed a timely appeal of the government's proposed corrective action.

triggered unless the Army acknowledged that the first evaluation of proposals was unlawful and that there needed to be a second, lawful examination of proposals. *Id.* at 12.

Given the uncertainty as to the appropriate deadline for avoiding waiver of a corrective action protest, and the lack of precedential authority for extending the waiver rule in *Blue & Gold Fleet* to protests of corrective action notices such as the one issued by the Army here, the cases cited by Raytheon and the government fail to persuade the court that Sotera necessarily waived its right to protest the Army's decision to re-evaluate proposals.[10]

### 3.    GAO Decisions

The court now considers whether GAO decisions which have considered waiver in the context of corrective action protests are persuasive, even though GAO decisions are not binding precedent for this court. *See, e.g.*, *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1331 n.1 (Fed. Cir. 2011) (stating that GAO decisions do not create binding precedent for the Federal Circuit); *XTRA Lease, Inc. v. United States*, 50 Fed. Cl. 612, 618 (2001) (stating that "GAO decisions are not binding on this court") (citation omitted). The government and Raytheon cite to a pair of GAO decisions issued in 2008-09 as support for their waiver arguments. *See* Def.'s Mot. at 15 (citing *Northrop Grumman Info. Tech., Inc.*, B-400134.10, 2009 CPD ¶ 167 (Comp. Gen. Aug. 18, 2009); *Domain Name Alliance Registry*, B-310803.2, 2008 CPD ¶ 168 (Comp. Gen. Aug. 18, 2008)); Raytheon Mot. at 32 (citing *Northrop Grumman*); Raytheon Reply at 5 (citing *Domain Name*). The principle that defendant and intervenor-defendant attempt to distill from these two cases is best summarized by the government:

---

[10]/   At least one judge of this court appears to suggest that the waiver rule set forth in *Blue & Gold Fleet* should not be applied too broadly in corrective action protests:

> [H]ad [the agency] at any point in taking corrective action modified its solicitation and called for new proposals, then the somewhat extended doctrine of timeliness and waiver represented by the progeny of *Blue & Gold Fleet* in this court could well have been triggered.

*Vanguard Recovery Assistance v. United States*, 99 Fed. Cl. 81, 92 (2011) (footnote omitted).

> GAO has long held that a protest "which challenges the
> way in which the agency will conduct its corrective
> action and recompetition, is analogous to a challenge to
> the terms of a solicitation," and, thus, any such challenge
> must be raised prior to award to be timely.

Def.'s Mot. at 15 (quoting *Domain Name* and citing *Northrop Grumman*).  It
would be more accurate, however, to state that the GAO has stated that *some* such
corrective action challenges must be raised prior to award to be timely.

The full GAO corrective action protest waiver rule is stated in a more recent
GAO decision:

> Because [Earth Resources Technology's (ERT's)] protest
> of the agency's decision in this regard amounts to a
> challenge of the agency's corrective action *and* the
> ground rules established for the competition, *see
> Northrop Grumman Info. Tech, Inc.*, B-400134.10, Aug.
> 18, 2009, 2009 CPD para. 167 at 10; *Domain Name
> Alliance Registry*, B-310803.2, Aug. 18, 2008, 2008
> CPD para. 168 at 7, it was unreasonable for ERT to wait
> until July 11, after having received its debriefing
> regarding the award decision, to protest NASA's
> decision in this regard.  Rather, because ERT knew or
> should have known of this basis of protest as a
> consequence of ERT's counsel receiving the [corrective
> action notice], ERT should have, at the latest, protested
> the agency's decision not to hold . . . discussions within
> 10 days of receiving the [correction action notice], or by
> July 6.  Having failed to timely protest this matter, the
> allegation is dismissed.  4 C.F.R. sect. 21.2.

*Earth Res. Tech., Inc.*, B-403043.2, 2010 CPD ¶ 248, 2010 WL 4304182, at *4
(Comp. Gen. Oct. 18, 2010) (emphasis added).  This full exposition of the GAO's
waiver rule, putting aside for the moment the fact that the GAO applies a ten-day
timeliness rule which does not apply to this court's bid protest jurisdiction,
supposes that some corrective actions affect the ground rules of the competition

and that some do not.  This distinction is explained, at least to some degree, in a more recent GAO decision:

> As an initial matter, we note that we have considered the merits of various protests challenging the adequacy of an agency's proposed corrective action.  In doing so, in those instances where the agency's proposed corrective action alters or fails to alter the ground rules for the competition (*i.e.*, aspects that apply to all offerors), we have considered a protester's challenge of such to be analogous to a challenge to the terms of a solicitation, thus providing the basis for protest prior to award.  *Domain Name Alliance Registry*, *supra* (protest challenging agency's decision not to reopen discussions); *Northrop Grumman Info. Tech., Inc.*, B-400134.10, Aug. 18, 2009, 2009 CPD ¶ 167 at 10 (protest challenging agency's decision not to hold discussions or permit clarifications); *see* 4 C.F.R. § 21.2(a)(1) (2012).  However, in those instances where the agency's proposed corrective action does not alter the ground rules for the competition, we have considered a protester's preaward challenge to be premature.  *Alliant Techsystems, Inc.*, B-405129.3, Jan. 23, 2012, 2012 CPD ¶ 50 at 2 n.1 (protest challenging the agency's evaluation as improper); *Northrop Grumman Tech. Servs., Inc.*, B-404636.11, June 15, 2011, 2011 CPD ¶ 121 at 4 (protest challenging the agency's discussions as unequal).

*SOS Int'l, Ltd.*, B-407778.2, 2013 CPD ¶ 28, 2013 WL 121161, at *2 (Comp. Gen. Jan. 9, 2013) (*SOS International*).

In its examination of the GAO's waiver doctrine, as it applies to corrective action protests, the court asked the parties to comment on whether the Army's corrective action notice in this case altered the ground rules of the competition for the EWPMT contract.  In response plaintiff's counsel stated that the corrective action did "not change the ground rules of the competition [because it had] no impact on the other offerors and there [were] no revisions to proposals."  Tr. at 90. Raytheon's counsel disagreed, stating emphatically that the Army's corrective

action altered the ground rules of the competition because the Army would "go back and do another evaluation." *Id.* at 69.  Government counsel's response was less definitive:

> [W]e did not change the ground rules. . . .  We set a ground rule. . . .  [D]epending on where the court is going with the question, you know, I'd have to say that we did set a ground rule, but I'm not saying we – and I would not say that we changed the ground rule in any significant fashion.

*Id.* at 93-94.

The court is not convinced that the GAO's formulation of a waiver and ripeness doctrine for corrective action protests is of much utility in this case.  First, the GAO must impose a strict ten-day deadline for the filing of protests, 4 C.F.R. § 21.2(a)(2) (2014); this court has no such imperative.  Second, the GAO employs an obscure distinction between a "proposed corrective action [that] alters or fails to alter the ground rules for the competition (*i.e.*, aspects that apply to all offerors)," and a "proposed corrective action [that] does not alter the ground rules for the competition."  *SOS International*, 2013 WL 121161, at *2 .  This GAO doctrine, in the court's view, relies overmuch on determining whether the "ground rules" of the competition have been altered, however those ground rules might be defined.  For these reasons, the court will not rely on *Domain Name* or *Northrup Grumman* as persuasive authority to support the extension of *Blue & Gold Fleet* to the circumstances of this case.

If the court *were* to rely on the GAO's doctrine of corrective action protest waivers, at least one decision could be viewed as favoring Sotera.  *SOS International* discusses a protest of a corrective action not very different from the corrective action undertaken in the instant case.  The protestor in *SOS International* argued that a corrective action which only re-evaluated price proposals, rather than entire proposals, was inadequate.  *See SOS International*, 2013 WL 121161, at *2 (reporting that the protestor "argues that the course of action contemplated by the agency – reevaluating offerors' price proposals but not also the technical and past performance proposals – will lead to an improper evaluation").  The GAO protest was dismissed as premature, because the partial

re-evaluation decision "does not effectively incorporate [various aspects of the evaluation] into the ground rules for the competition." *Id.*

Here, the Army's intent to "examine all proposals and evaluations for offerors . . . and . . . re-evaluate as appropriate" also, arguably, does not incorporate aspects of the evaluation into the ground rules of the EWPMT competition. Indeed, the corrective action announced in *SOS International* appears to have been more specific than the corrective action notice issued by the Army here, but was still seen as a preliminary government action not yet subject to protest. Although Raytheon and the government rely on the GAO's waiver doctrine regarding corrective action protests to dismiss Count I of the complaint, that doctrine, as applied in *SOS International*, would just as likely have rejected any Sotera protest of the Army's corrective action plan, if filed within ten days of receipt of the Army's corrective action notice, as unripe. The court therefore cannot dismiss Count I of the amended complaint based solely on the GAO doctrine of waiver in corrective action protests.

### 4.    No Waiver in these Circumstances

Sotera's delay in challenging the re-evaluation of proposals presents a close question of waiver. If the facts were slightly different, an extension of the waiver doctrine might well apply. Nonetheless, having given due consideration to the cases and decisions relied upon by the parties, as well as to the text of the Army's corrective action notice and the clarification of that notice, no waiver, as described by *Blue & Gold Fleet* or other binding precedent, occurred here. In the circumstances of the EWPMT procurement corrective action announced by the Army, Count I of Sotera's amended complaint was not waived.

### B.    The Agency's Decision to Re-evaluate Proposals Survives Review

### 1.    No Absolute Bar to Re-evaluation

Sotera contends that the Army was precluded from re-evaluating the EWPMT proposals after Sotera had been awarded the contract. *See* Pl.'s Mot. at 24 (stating that "the Army did not have a lawful basis to 'reevaluate' the original proposals and second-guess its original judgments"). Unfortunately for plaintiff's position, there is no binding authority which supports that argument. Furthermore, plaintiff's reliance on FAR 33.102(b) is misplaced. *See* Pl.'s Mot. at 26-27

(stating that "FAR 33.102(b) does not allow an agency to change its mind simply because it later believes, upon further reflection, that a different offeror represents a better value").  The FAR provision relied upon by plaintiff merely states, in discussing an agency's response to a protest, that:

> If, in connection with a protest, the head of an agency determines that a solicitation, proposed award, or award does not comply with the requirements of law or regulation, the head of the agency may . . . [t]ake any action that could have been recommended by the Comptroller General had the protest been filed with the Government Accountability Office[.]

48 C.F.R. § 33.102(b) (2013).  This regulation does not contain any bar to the re-evaluation of proposals undertaken in response to a protest filed at the GAO.

To the extent that Sotera interprets a decision of this court to severely limit proposal re-evaluation as a corrective action option for federal agencies seeking to moot protests filed at the GAO, the court must disagree.  *See* Pl.'s Mot. at 24-27 (citing *Sys. Application & Techs., Inc. v. United States*, 100 Fed. Cl. 687 (2011) (*SA TECH I*), *aff'd on other grounds*, 691 F.3d 1374 (Fed. Cir. 2012).  First, decisions of this court are not binding precedent for judges of this court.  *AINS, Inc. v. United States*, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004), *abrogated on other grounds by Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc).  Second, the passage in *SA TECH I* relied upon by plaintiff is a brief, alternative holding supported by minimal analysis.  *See* 100 Fed. Cl. at 719 (stating that the court "briefly consider[ed] whether the Army's decision to take corrective action also violates a statute or regulation").  Third, *SA TECH I* is distinguishable on its facts, because the court in *SA TECH I* first determined that the re-evaluation decision was irrational (a finding which, as discussed *infra*, does not pertain here) before deciding that the re-evaluation decision was also unlawful.  *See id.* (stating that "[a]lthough the court has determined that the Army's decision to take corrective action lacks a rational basis, it briefly considers whether the Army's decision to take corrective action also violates a statute or regulation").

For all of these reasons, the court rejects plaintiff's contention, based on its reading of *SA TECH I*, that a federal agency may only re-evaluate proposals, when responding to a protest, if the agency first finds that its previous evaluation was

either significantly flawed or unlawful.  *See Impresa*, 238 F.3d at 1332 ("[T]he courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994))).  As the government notes, Sotera's restrictive view of corrective action would require an agency to pre-determine the results of its re-evaluation of proposals before actually conducting such a re-evaluation.  Def.'s Mot. at 19. Finding that neither precedent nor logic supports Sotera's contentions in this regard, the court holds that the Army was exercising its lawful discretion when it chose to re-evaluate proposals to consider the protest grounds raised by Raytheon in its GAO protest.

### 2.    The Army's Decision to Re-evaluate Proposals was Not an Abuse of Discretion

Sotera also argues that it was an abuse of discretion for the Army to re-evaluate proposals.  Pl.'s Mot. at 24; Pl.'s Reply at 26.  Procurement actions which lack a rational basis are an abuse of the agency's discretion.  *Impresa*, 238 F.3d at 1332-33.  Here, the record shows that the Army chose to re-evaluate proposals because Raytheon's critique of the evaluation process and award decision was taken seriously.  *See* AR Tabs 50-51.  One clear error was found in the initial past performance evaluation of Sotera's proposal, regarding the weight accorded the past performance of Sotera's sub-contractors.  *See id.* at 8555, 8599-600, 8603. Revisions were also made in the evaluation of Raytheon's technical proposal.  The court does not find, on this record, that the decision to re-evaluate proposals lacked a rational basis.  The court therefore disagrees with the contentions of Count I of the amended complaint, and finds that the decision to re-evaluate proposals was neither unlawful nor an abuse of discretion.

## V.    Analysis for Count III of the Amended Complaint

### A.    Waiver of Protest of the Price Evaluation Methodology Used to Rate Raytheon's Proposal, Where that Methodology Was Disclosed in the Solicitation

The amended complaint challenges the price evaluation of Raytheon's proposal:

> The Army's cost evaluation was fundamentally improper
> because the Army allowed Raytheon to take advantage
> of the procurement by proposing substantially fewer
> labor hours on the basis that it had already developed [ ]
> of the [CD1] requirements.  While there is nothing
> improper with such a proposal, it directly undermined
> the purpose and fairness of the cost evaluation and, thus,
> it became incumbent upon the Army to take affirmative
> steps to ensure that the cost evaluation achieved its core
> purpose (i.e., identifying the relative cost value of each
> proposal for the EWPMT program).

Am. Comp. ¶ 132.  The solicitation disclosed, however, that the Army would
evaluate price by considering an offeror's costs for CD1 alone, not that offeror's
costs for the entire contract.  AR at 739, 745.  In plaintiff's view, the Army was
required to modify its cost evaluation methodology in order to accurately rate
Raytheon's proposal.  The court must agree with Raytheon and the government
that Count III challenges how the solicitation term governs cost evaluations, and
that such a challenge is untimely under *Blue & Gold Fleet*.  *See* Raytheon's Mot.
at 48 ("If Sotera felt that the Agency should have considered the costs to perform
all CD1 requirements, regardless of an offeror's approach and whether or not
those costs would be charged to the Agency, then Sotera was required to object
prior to the closing date for receipt of proposals." (citing *Blue & Gold Fleet*, 492
F.3d at 1314)); Def.'s Mot. at 44 ("Sotera's cost challenge was waived, because
this argument necessarily challenges the express cost evaluation criteria
established in the solicitation." (citing *Blue & Gold Fleet*, 492 F.3d at 1308,
1313)).

## B.   Price Evaluation Not Shown To Be Irrational

To the extent that Sotera attacks the rationality of the Army's decision to
hold fast to its cost evaluation methodology when faced with the particular cost
elements of Raytheon's proposal, the court is not persuaded that the Army erred by
considering Raytheon's proposed and evaluated costs for CD1 to be reliable

indicators of the comparative cost of Raytheon's proposal.[11]  Plaintiff contends that:

> The Army had a responsibility to adjust Raytheon's proposed cost upward to a figure that was reflective of what it would cost for Raytheon to perform all CD1 requirements, as this was how all other offerors priced their proposals. . . .  The Army violated the law by failing to meaningfully consider the true cost of Raytheon's proposal for the underlying contract.

Pl.'s Mot. at 37-38 (footnotes omitted).  In addition, plaintiff points to higher rates that Raytheon would charge the government, for example, for labor and overhead, as evidence that Raytheon's proposal will cost much more than Sotera's proposal over the life of the contract. *Id.* at 29 (citing AR at 9475).  Raytheon and the government, on the other hand, argue that the Army was fully aware of the structure of Raytheon's cost proposal (offering some elements of CD1 to the Army at zero cost because of previous development work accomplished by Raytheon), and that the Army rationally concluded that Raytheon's evaluated cost for CD1 was accurately measured pursuant to the methodology required by the solicitation.

The court agrees that the cost evaluation of Raytheon's proposal was rational and in accordance with the solicitation's stated evaluation methodology. The court must agree, in particular, with the government's contention that Sotera's proposed adjustments to Raytheon's costs over the life of the entire contract are too speculative to invalidate the Army's evaluated cost for Raytheon's CD1 – $11,258,505.  Def.'s Reply at 20 (citing AR at 9292, 9302).  The court must also concur with Raytheon's contention that [ ] do not necessarily indicate higher future costs.  As pointed out by Raytheon, despite [ ] a contractor's overall future costs may well be offset by the deployment of heightened employee efficiencies and superior processes, as compared to those of its competitors. Tr. at 80-81. Thus, projecting Raytheon's costs of performance over the life of the contract is not as simple as plaintiff appears to suggest.

---

[11]/  There is substantial overlap between Counts II and III of the amended complaint, which both question the rationality of the Army's cost evaluation of Raytheon's proposal. *Compare* Am. Compl. ¶¶ 105-08, 122-25, *with id.* ¶¶ 132-37.  The court addresses such arguments here, and will not return to the topic in its discussion of Count II.

Ultimately, although Sotera asks the court to substitute its judgment for the agency's, this court must defer to the agency's technical expertise as to the cost evaluation of the proposals submitted in the competition for the EWPMT project. Because the cost evaluation of Raytheon's proposal contained in the AR has not been demonstrated to be irrational, the court cannot sustain Sotera's protest on this ground. The court now turns to one of the most hotly contested issues in the procurement, the issue of whether unstated evaluation criteria were used in the re-evaluation of the EWPMT proposals.

## VI.   Analysis for Count IV of the Amended Complaint

### A.   The SSAC Chair's Email

The controversy addressed in Count IV of the amended complaint centers on the email sent by the SSAC Chair to the SSEB asking that they place "extra emphasis" on certain aspects of the offerors' proposals during the re-evaluation. AR Tab 51. Although the email also highlighted aspects of the evaluation of the Past Performance information provided by the offerors, the focus of Count IV is on the Technical Factor re-evaluation, and especially but not exclusively on the re-evaluation of the Management sub-factor. Plaintiff accuses the Army of unlawfully re-evaluating proposals using "unstated evaluation criteria" that were developed in response to the SSAC Chair's email.[12] Am. Compl. ¶¶ 160-61.

Plaintiff disavows accusing the Army of re-evaluating the proposals in bad faith so as to direct award to Raytheon. *See* Pl.'s Reply at 19 (stating that the "higher burden of proof" for bad faith does not apply to Sotera's Count IV); Tr. at 82 ("We're not arguing bad faith."). Thus, the court's task is to determine whether the re-evaluation of the Technical Factor impermissibly strayed from the evaluation criteria stated in the solicitation. In fact, the text of the email itself implicitly raises the question of whether the Source Selection Evaluation Plan (SSEP) (which undisputedly tracks the solicitation's statement of evaluation

---

[12]/ Sotera relies on a declaration submitted with its reply brief for an analysis of the "unstated evaluation criteria" allegation (and for other purposes). *See* Pl.'s Reply at 17 & n.14. The court did not consider this declaration because the resolution of the evaluation criteria dispute was made clear by the AR itself. *See Axiom*, 564 F.3d at 1380 (restricting supplementation of the administrative record to circumstances where omission of the materials would frustrate judicial review).

criteria) was correctly followed by the Army, or whether the extra emphasis requested by the SSAC Chair impermissibly altered the evaluation criteria set forth in the solicitation:

> Steve/SSEB Team, as you reassess ratings for each of the
> 4 Offerors from the final competitive range ensure that
> you are following SSEP guidance in strict accordance
> with evaluation criteria and definitions.  In addition,
>
> I would like extra emphasis placed on the following . . . .

AR at 8505.

Plaintiff urges the court to construe this email as unfairly replacing neutral evaluation criteria with criteria blatantly favoring Raytheon.  The government and Raytheon argue that the SSAC Chair urged the SSEB to follow the SSEP and, in order to correctly apply the SSEP's evaluation criteria, to confirm whether the evaluation of certain identified aspects of proposals was indeed accurate.  In that regard, the government argues that the SSAC Chair's reference to extra emphasis does not indicate that the SSEB would be "putting extra weight on" unstated evaluation criteria; instead, the SSEB would simply "review[] certain concerns or issues" during the re-evaluation.  Tr. at 43.

In the court's view, the email could be read either way.  Certainly, many, if not all, of the topics designated by the SSAC Chair for extra emphasis or examination respond to topics raised in Raytheon's protest, and proprietary software developed by Raytheon is mentioned by name as an example of an "efficienc[y]."  AR at 8505.  Also highlighted is a certification level obtained by Raytheon and not obtained by the other offerors (CMMI level 5 versus CMMI level 3).[13]  *Id.*

On the other hand, the SSEB is reminded in the email of the importance of adhering to the evaluation criteria stated in the SSEP, and the emphasis requested is framed as an inquiry into value, not as a directive to necessarily accord strengths

---

[13]/  The acronym CMMI refers to "Capability Maturity Model Integration."  AR at 9471. Certification at a particular CMMI level relates to an offeror's software development processes. *Id.* at 10941-42.

to certain aspects of the offerors' proposals. The court notes, too, that this email dated August 15, 2013 references further discussions on August 26, 2013, and that the SSEB's work continued into October 2013. While the SSAC Chair's email directs the SSEB to focus its examination in particular upon certain issues that had been flagged as concerns as a result of the GAO protest, there is a distinction between directing the evaluation board to give those areas *extra scrutiny* as opposed to *extra credit*. Thus, although the SSAC Chair's email sends the SSEB off in a certain direction, the documents produced at the end of this process must be analyzed to identify the evaluation criteria that were actually used in the Army's re-evaluation of proposals.

### B.    SSEB Findings

Three documents present the SSEB's re-evaluation results for Sotera's and Raytheon's proposals. The first is a set of slides presented to the SSAC, AR Tab 56, and the other two documents are narrative re-evaluation reports for each offeror, *id.* Tabs 58-59. Plaintiff, relying heavily on the differences between the original evaluation for Raytheon's proposal and the re-evaluation results, concludes that:

> [A]ll of the material changes to the SSEB report directly correlated to the key complaints in Raytheon's debriefing and protest, and in turn the unstated criteria reflected in the SSAC Chair's instructions.

Pl.'s Mot. at 14. Plaintiff therefore alleges that the improvements in Raytheon's evaluation ratings are the direct result of impermissible unstated evaluation criteria.

The government disagrees, and connects the improved SSEB ratings for Raytheon's proposal to the evaluation criteria set forth in the solicitation. Def.'s Mot. at 23-31. Raytheon, in its moving brief, performs a similar analysis of the evaluation criteria applied by the SSEB. Raytheon Mot. at 21-26. The government's and Raytheon's arguments are persuasive. The court finds no evidence that the SSEB applied criteria in the proposal re-evaluations that were not set forth in the solicitation. *See* Def.'s Mot. at 23 (citing cases upholding the agency's discretion to interpret the scope of proposal evaluation criteria). The court finds that the SSEB's re-evaluation results, AR at 8555, 8597, 9249, 9310,

were rational applications of the evaluation criteria explicitly set forth in the solicitation.

A detailed review of the parties' arguments in this regard is not necessary. The alteration in the Past Performance evaluation results for Sotera, and the additional strength in the Management sub-factor for Raytheon, are well-documented in the record and adequately explained.  Pursuant to Sections L and M of the solicitation, all of the material changes to the evaluation ratings for Raytheon's and Sotera's proposals reflect considerations that are within the scope of the evaluation criteria publicly established by the Army.  The SSEB adhered to these criteria when it found Raytheon's proposal to evidence an "ability to meet the demands of an aggressive schedule without sacrificing performance and increasing cost in any functional domain."  AR at 9264.

The court therefore finds that the SSEB's re-evaluation results are rational and did not employ unstated evaluation criteria.  To the extent that Sotera compares this case to *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100 (2011), the court finds the analogy strained.  That case involved an agency's substitution of undisclosed evaluation criteria for those announced in the solicitation – here, the Army applied the same set of disclosed criteria in a second, closer look at proposals.  The court finds nothing improper in the criteria employed in the SSEB's re-evaluation of proposals.[14]

### C.   SSAC Recommendation and the SSA Award Decision

The SSAC and the SSA agreed with the SSEB's revised evaluations of Sotera's and Raytheon's proposals.  *See* AR Tabs 60-62.  The SSAC noted the evolution from the prior evaluation results to the re-evaluation results and explained the differences.  *Id.* at 9372-73, 9416, 9419, 9463.  The SSAC then performed a comparative analysis of proposals and recommended award to Raytheon.  *Id.* at 9469-73, 9477-78.  Nothing in the SSAC's analysis shows that the evaluation criteria of the solicitation were replaced by unstated evaluation criteria.

---

[14]/  The SSAC Chair's instructions, AR Tab 51, certainly *could* have led to an improper substitution of an altered set of evaluation criteria.  On this record, however, the SSEB obeyed his specific instruction to "ensure that you are following SSEP guidance in strict accordance with evaluation criteria and definitions."  *Id.*

The SSA's award decision reflects a careful consideration of the evaluation ratings and recommendations produced by the SSEB and the SSAC.  AR Tab 62. The SSA explains that the re-evaluation was undertaken as a part of the corrective action that mooted Raytheon's protest at the GAO.  *Id.* at 9481.  Although the SSA does not explicitly disavow his previous decision to award Sotera the EWPMT contract, he states that his decision to award the EWPMT contract to Raytheon is based on his review of the SSEB's re-evaluation results and the evaluation criteria set forth in the solicitation.  *Id.*  The court finds that the SSA's award decision did not rely on unstated evaluation criteria.  The court specifically rejects Sotera's contention that the SSAC Chair's email tainted the procurement by introducing a different set of evaluation criteria that were employed throughout the re-evaluation process.

To the extent that plaintiff argues that it is unfair, or that various FAR provisions are violated when an agency re-evaluates proposals and concurrently considers the validity of allegations of evaluation error that have been raised in a prior GAO protest, the court cannot agree.  As long as the agency adheres to the evaluation criteria set forth in the solicitation, the court believes that an agency has the discretion to re-evaluate proposals during a corrective action and to correct prior evaluation errors.  *See Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 569 (2012) ("Agency evaluators must be allowed the discretion to review their own conclusions if they conclude a mistake has been made, or if further inquiry appears appropriate, provided the re-evaluation conforms with the solicitation, including any modifications to the solicitation and the evaluation process is conducted in a manner fair to all offerors.").  Here, the record shows that the re-evaluations were done fairly and in conformance with the solicitation's evaluation criteria.  For this reason, Sotera's protest cannot be sustained on the grounds raised in Count IV of the amended complaint.

## VII.  Analysis for Count II of the Amended Complaint

The court now turns to plaintiff's arguments which challenge the rationality of the SSEB's re-evaluation of proposals.[15]  Three principal arguments are raised: (1) The Army inappropriately minimized the cost premium it would pay for

---

[15]/ As intervenor-defendant notes, not all of Sotera's challenges to the re-evaluation were presented in its motion for judgment on the administrative record.  Raytheon's Mot. at 46 n.23. The court limits its discussion here to the arguments Sotera raised in its dispositive motion.

Raytheon's proposal; (2) The Army did not adequately explain its trade-off decision, especially in light of the fact that a trade-off analysis favored Sotera's proposal in the Army's earlier award decision; (3) The Army's best value decision was flawed because the technical advantages of Raytheon's proposal did not outweigh the cost premium that the Army would pay if it chose Raytheon's EWPMT proposal over Sotera's proposal.  The court will address each of these arguments in turn.

## A.    Correctly Identified Magnitude of Cost Premium

The difference between the evaluated costs of Raytheon's and  Sotera's proposals ($11,258,505 and $10,325,671, respectively) was documented in the Army's re-evaluation of proposals as a difference of 8.3%.  AR at 9475, 9486-87. Sotera does not accuse the Army of any math errors in comparing the evaluated costs of proposals.  Nor does Sotera state that it is *per se* irrational for the Army to pay an approximately 9% cost premium for a contract of this size and type. Instead, Sotera argues that the Army downplayed, minimized and mischaracterized the cost premium it would pay for Raytheon's proposal.  Pl.'s Mot. at 28-30. Plaintiff argues that the SSAC's use of the words "minor" and "slight" to describe the cost premium constituted arbitrary or irrational decision-making.  *Id*. at 30.

The court finds that the SSAC was not irrational in its description of the cost premium associated with Raytheon's proposal.  The costs of Raytheon's and Sotera's proposals were properly measured pursuant to the evaluation criteria of the solicitation and were presented in an accurate fashion.  The adjectives used to describe the cost premium were neither obviously inaccurate nor misleading because they were accompanied by the actual evaluated costs of the proposals and the percentage difference between them.  Further, the SSA did not adopt the adjectives that plaintiff finds objectionable.[16]  *See* AR at 9486-87; Def.'s Reply at 16 n.11.  For all of these reasons, plaintiff has failed to show that the Army's assessment of the magnitude of the cost premium it would pay for Raytheon's proposal was arbitrary or capricious.

## B.    Adequate Documentation of the Trade-Off Decision

---

[16]/  The court did not rely on post-hoc rationalizations offered by the SSA during Sotera's GAO protest, AR at 12545-47, for any purpose.

Plaintiff contends that the SSA failed to provide the required documentation of his independent judgment and rationale for choosing Raytheon's proposal for the EWPMT project. *See* Pl.'s Mot. at 30-31 (relying in particular on FAR 15.308 and cases discussing the SSA's documentation responsibilities). Plaintiff also argues that a trade-off decision must be especially well-documented when, after re-evaluating the same proposals, an agency cancels an award to one offeror so as to award the contract to another. *See* Pl.'s Reply at 27 ("[T]he Army did not adequately document the source selection decision because the SSA failed to explain why he changed his mind." (citing *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 100 (2013))). Plaintiff's arguments fail to persuade, however, because the SSA's decision in this case satisfies the requirements of FAR 15.308. The court notes, too, that *Caddell* does not identify a heightened standard for documentation when an SSA changes his mind as to contract award. *See* 111 Fed. Cl. at 105-110 (thoroughly examining the requirements of FAR 15.308 and not discussing the circumstances of an SSA changing his mind as to an award decision).

FAR 15.308 simply states that:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

The SSA's decision in this case fully meets these requirements. AR Tab 62. In addition, as the government and Raytheon argue, nothing in FAR 15.308 can be interpreted as heightening the documentation requirement for an award decision based on a re-evaluation of proposals, as opposed to an initial evaluation of proposals. Def.'s Mot. at 40; Raytheon's Mot. at 42. The court also distinguishes

the procurement documentation in this case from protests where the source selection document failed to explain a trade-off/best value award which paid a cost premium (or refused to pay a cost premium) for a more highly ranked proposal. *See Caddell*, 111 Fed. Cl. at 105-10 (discussing cases). Because the SSA's trade-off rationale and best value award decision are adequately documented under both FAR 15.308 and this court's jurisprudence, the court cannot sustain Sotera's protest on this ground.[17]

## C. Best Value Award Decision Rationally Weighed the Technical Advantages of Raytheon's Proposal

Plaintiff disagrees with various aspects of the re-evaluation of Raytheon's and Sotera's proposals, and suggests that a rational evaluation of the differences between these two proposals would not have found that Raytheon's proposal merited a cost premium of approximately 9%.[18] *See* Pl.'s Mot. at 31 ("The evaluated 'advantages' of Raytheon's proposal did not rationally justify payment of Raytheon's substantial cost premium."); Pl.'s Reply at 28 ("None of the alleged attributes of Raytheon's proposal can rationally justify a 9% cost premium."). The court notes that its review of technical evaluation ratings and best value award decisions is deferential to the expertise and discretion of procurement officials. *See supra*. The court has considered each of plaintiff's arguments regarding technical re-evaluation errors but limits its discussion here to the principal arguments raised by Sotera.

---

[17]/ There is ample authority which recognizes that a re-evaluation of proposals may rationally result in a different award outcome. *See, e.g., Vanguard Recovery Assistance v.* United States, 101 Fed. Cl. 765, 786 (2011) ("[A]n agency has the right to change its mind in the course of an evaluation if it has good reason.") (citations omitted); *Marcola Meadows VA LLC*, B-407078.2, 2013 CPD ¶ 141, 2013 WL 2468753, at *7 (Comp. Gen. June 4, 2013) ("[I]t is implicit that a reevaluation can result in different findings and conclusions.") (citations omitted).

[18]/ Sotera relies on a declaration submitted with its reply brief for an analysis of the relative merits of its and Raytheon's proposals. *See* Pl.'s Reply at 28. The court did not consider this declaration because the resolution of plaintiff's challenge to the re-evaluation of proposals was adequately informed by the AR and the parties' arguments on the record. *See Axiom*, 564 F.3d at 1380 (restricting supplementation of the administrative record to circumstances where omission of the materials would frustrate judicial review).

Plaintiff argues that the re-evaluation should not have preferred Raytheon's SWIFT software development process over Sotera's Agile Architecture System Engineering (A2SE) software development process.  Pl.'s Mot. at 32-35.  In essence, Sotera suggests that its process was of equivalent value.  *Id.* at 33.  The court has reviewed the SSEB's re-evaluation of the Management sub-factor, AR at 9259-65, 9319-23, and concludes that the Army could rationally prefer SWIFT over A2SE.

Plaintiff also complains that Raytheon's CMMI level 5 certification for software development processes, as opposed to Sotera's CMMI level 3 certification, would not justify the cost premium that the Army would pay for Raytheon's proposal.[19]  Pl.'s Mot. at 35.  At most, Sotera argues, CMMI level 5 certification could provide only a "relatively minor advantage."  *Id.*  At oral argument, plaintiff's counsel attempted to explain the difference between level 5 and level 3 in CMMI certification:

> [I]f you choose to become Level 5 rated, as Raytheon has, you're essentially adopting procedures.  You're subjecting yourself to layers of additional procedure, multiple processes and – I mean, think of it as sort of being a bureaucratic way.  I'm not trying to be critical of it, but it's additional layers of review that creates enormous expense.  This is – one of the reasons why Raytheon's hourly rates are substantially higher than Sotera's.  Level 5 contractors have higher rates and the Government has to pay for it.
>
> A lot of companies like Sotera, they don't want Level 5 or at least they don't need it if the customers don't want it.  And they've had customers that have told them, we don't want Level 5.  We want to pay for Level 3 because Level 5's not necessary.

---

[19]/ Raytheon relied on an exhibit attached to its reply brief to explain the differing levels of CMMI certification.  The court did not consider this exhibit because the AR and the parties' arguments regarding CMMI fully aired the issue.  *See supra* nn.12, 18.

Tr. at 25.  It is undisputed that during the re-evaluation much more attention was paid to CMMI certification levels than occurred in the Army's first evaluation of proposals.  *Compare* AR at 8047-48, *with id.* at 9479.  The court has considered the parties' arguments regarding the weight accorded Raytheon's CMMI level 5 certification, and finds that this aspect of Raytheon's proposal could rationally be used as a discriminator in determining the best value EWPMT proposal.

The court has discerned no error which invalidates the results of the re-evaluation of Raytheon's proposal.  In addition, although Sotera argues that its proposal was erroneously denied strengths and improperly viewed as inferior to Raytheon's proposal, the court does not find the re-evaluation of Sotera's proposal to have been arbitrary or capricious.  Even though the court agrees with plaintiff's contention that this was a close competition for the EWPMT contract, the Army's best value award decision was rational.  Given the deferential standard of review applicable here, the Army's award decision must stand.

## CONCLUSION

In the end, plaintiff has not met its burden to show that the Army's best value award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Sotera's protest cannot be sustained.  Because plaintiff has not succeeded on the merits of its protest, the court need not consider whether the standard for injunctive relief has been met in this case.

Accordingly, it is hereby **ORDERED** that

(1)    Plaintiff's Motion for a Preliminary Injunction, filed April 1, 2014, is **DENIED**;

(2)    Plaintiff's Motion for Judgment on the Administrative Record, filed May 2, 2014, is **DENIED**;

(3)    Plaintiff's Motion to Amend the Protective Order, filed May 6, 2014, is **WITHDRAWN**;

(4)    Defendant's and Intervenor-Defendant's Motions to Dismiss, included with their motions for judgment on the administrative record

filed May 19, 2014, are **GRANTED in part**, as to Count III of the Amended Complaint, and **DENIED in part**, in all other respects;

(5)    Defendant's and Intervenor-Defendant's Cross-Motions for Judgment on the Administrative Record, filed May 19, 2014, are **GRANTED**;

(6)    Plaintiff's Motion to Withdraw Motion to Amend the Protective Order, and Unopposed Motion for Permission to Release Document Outside of the Protective Order, filed June 26, 2014, are **GRANTED**;

(7)    The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, **DISMISSING** the complaint with prejudice;

(8)    On or before **August 11, 2014**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(9)    Each party shall bear its own costs.

/s/Lynn J. Bush          
LYNN J. BUSH
Senior Judge